IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Patricia Hammonds,

     Plaintiff,

     v.                          Case No. 2:13-cv-310

Aetna Life Insurance Co.,
et al.,

     Defendants.

<u>OPINION AND ORDER</u>

This is an action filed by Patricia Hammonds, a former employee of Cox Enterprises, Inc. ("Cox Enterprises"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(b), to recover long-term disability ("LTD") benefits from defendant Cox Enterprises, Inc., Welfare Benefit Plan, which includes the Cox Enterprises, Inc. Long Term Disability Flex Plan ("the Plan"). Cox Enterprises is Plan administrator and defendant Aetna Life Insurance Co. ("Aetna") is the claims administrator for the Plan. AR 824, 948.

Under the terms of the Plan, a participant is totally disabled in the first 24 months of a period of total disability when the participant is "not able, solely because of injury or disease, to work at your own occupation." AR 809. After the first 24 months of a period of total disability, a participant is totally disabled when the participant is "not able, solely because of injury or disease, to work at any reasonable occupation." AR 809. A reasonable occupation is "any gainful activity for which the participant is, or may reasonably become, fitted by education, training or experience." AR 809. According to the Summary Plan Description ("SPD"), a participant is disabled after the first 24

months of a period of disability if he is not able, solely because of injury or disease, to work at any reasonable occupation, defined as "any gainful activity which you are or reasonably could become qualified to perform through education, training or experience earning equal to your LTD benefit but no less than 60% of predisability earnings." AR 921. A period of total disability ends as of the date that the participant is not totally disabled or "fails to give proof that the participant is still totally disabled or complies with Plan guidelines." AR 809-10.

Plaintiff was employed by Cox Enterprises as a CR writer/inspector. Her position involved inspecting the condition of vehicles and writing repair estimates. AR 411. Plaintiff's job required her to regularly stand, walk, reach, talk, and hear, to frequently stoop, kneel, crouch, and climb, and to have medium strength. AR 412. On November 13, 2009, she filed an application for LTD benefits, citing chronic back pain which rendered her unable to bend, stoop, lift weight, and sit or stand for long periods. AR 309-310. By letter dated January 8, 2010, plaintiff was notified that Aetna had determined that she was totally disabled from her own occupation and eligible to receive LTD benefits for up to eighteen months. AR 370. However, after requesting additional medical records and information from plaintiff, obtaining a review of plaintiff's file by an independent medical examiner, and securing a transferable skills analysis and a labor market analysis, Aetna advised plaintiff by letter dated November 11, 2011, that her disability benefits would end effective November 13, 2011, due to her failure to meet the "any occupation" definition of disability. AR 491. Plaintiff pursued an appeal

2

from that decision and provided Aetna with additional medical records. Aetna engaged three independent medical examiners to review plaintiff's file. By letter dated August 9, 2012, plaintiff was advised that the decision to terminate benefits was upheld. AR 298. Plaintiff filed her complaint in the instant case on April 3, 2013. This matter is before the court on the motions of the parties for judgment on the administrative record.

I. Standard of Review

A. Applicability of Arbitrary and Capricious Standard of Review

A plan administrator's denial of benefits is reviewed de novo unless the benefit plan specifically gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Morrison v. Marsh & McLennan Companies, Inc., 439 F.3d 295, 300 (6th Cir. 2006). Where an ERISA plan gives the plan administrator such discretionary authority, the administrator's decision is reviewed under the arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989).

The SPD provides: "The plan administrator is specifically empowered to exercise discretion in the interpretation of the terms of the plans or programs. Its determinations regarding the terms and eligibility will be conclusive and binding." AR 933. Under the terms of the Administrative Services Contract between Cox Enterprises and Aetna, Aetna agreed to provide services for the administration and operation of the Plan, and Cox Enterprises delegated to Aetna the authority to make determinations on behalf of Cox with respect to benefit payments under the Plan. AR 965, 971. The SPD further provides:

> Aetna, the claims administrator, has final authority to determine the amount of benefits that will be paid on any particular benefit claim.  In making such determinations, the plan administrator has the complete discretion and authority to make factual findings regarding a claim and to interpret the terms of the plan as they apply to the claim.  In any case, you will receive only those benefits under the plan that the plan administrator in its sole discretion , determines you are entitled to receive."

AR 935.  The court finds that the arbitrary and capricious standard of review applies in this case.

B. Conflict of Interest

Plaintiff contends that any financial conflict of interest on the part of the claims administrator should be considered in reviewing the decision to deny benefits.  In applying the arbitrary and capricious standard, a court will weigh as a factor whether a conflict of interest existed on the part of the decision-maker in determining whether there was an abuse of discretion.  Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008); Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 552-53 (6th Cir. 2008).  Any conflict of interest inherent in self-funded plans does not alter the standard of review, but rather is taken into account as a factor in determining whether the decision was arbitrary and capricious.  Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir. 1998).  However, "mere allegations of the existence of a structural conflict of interest are not enough to show that the denial of a claim was arbitrary; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits."  Id. at 433.

More weight is given to the conflict where circumstances suggest a higher likelihood that it affected the benefits decision.

DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440, 445 (6th Cir. 2009). A long history of biased claims administration may render the conflict more important, as opposed to a situation where the administrator has taken active steps to reduce potential bias and to promote accuracy, in which case the conflict is less important. See Curry v. Eaton Corp., 400 F.App'x 51, 58 (6th Cir. 2010). A plan participant must provide "significant evidence" that the conflict actually affected or motivated the benefits decision. Peruzzi, 137 F.3d at 433. If the conflict of interest did not actually motivate the administrator's decision, then it is given no weight as a factor in determining whether the decision was arbitrary and capricious. See Curry, 400 F.App'x at 59 (noting lack of indication that the denial of benefits specifically was motivated in any part by the conflict of interest); Pflaum v. UNUM Provident Corp., 175 F.App'x 7, 10 (6th Cir. 2006)(noting that where plaintiff pointed to nothing beyond the mere existence of a conflict of interest to show that the administrator's decision was motivated by self-interest, "we give no further consideration in the arbitrary and capricious analysis to the possibility that the conflict affected" the decision).

The Cox Enterprises Plan is a self-insured plan funded by employer and employee contributions. AR 824. Under the Administrative Services Contract between Cox Enterprises and Aetna, Aetna is paid an administrative charge for acting as claims administrator. AR 969-970. Cox agreed to give notice to employees that it was assuming complete financial liability for the payment of benefits under the Plan, and further agreed to indemnify Aetna for any loss, liability, expense, cost or obligation resulting from

and arising out of claims. AR 972-73. Because Aetna is not responsible for paying claims out of its own funds, preservation of Aetna's assets would not factor into a benefits determination. One could argue that Aetna might be motivated to conservatively award benefits to ensure that Cox Enterprises remained satisfied with its administrative services, for which it was paid an administrative charge. However, Cox Enterprises delegated to Aetna the authority to make determinations on behalf of Cox with respect to benefit payments under the Plan. There is no evidence that Cox Enterprises interfered with Aetna's exercise of discretion in any way or pressured Aetna to deny any application for benefits, including plaintiff's claim. No history of biased claims administration has been shown. In fact, Aetna granted plaintiff's initial claim for LTD benefits under the broader definition of total disability applicable to that claim. The circumstances of this case and the lack of evidence of bias weigh against a finding of any conflict of interest on the part of Aetna.

## II. Failure to Exhaust Administrative Remedies

Defendants argue that they are entitled to judgment because plaintiff allegedly failed to timely exhaust her administrative remedies under the Plan. ERISA's administrative scheme requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court. Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991). The decision whether to apply the exhaustion requirement is committed to the discretion of the district court. Costantino v. TRW, Inc., 13 F.3d 969, 974 (6th Cir. 1994). Exhaustion and review by plan administrators allows plan fiduciaries to efficiently manage their funds, to correct

their errors, to interpret plan provisions, and to assemble a factual record which will assist the court in reviewing the fiduciaries' actions. Ravencraft v. UNUM Life Ins. Co. of America, 212 F.3d 341, 343 (6th Cir. 2000)(citing Makar v. Health Care Corp. of Mid-Atlantic, 872 F.2d 80, 83 (4th Cir. 1989)).

Failure to exhaust administrative remedies is excused "'where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate.'" Coomer v. Bethesda Hospital, Inc., 370 F.3d 499, 505 (6th Cir. 2004)(quoting Fallick v. Nationwide Mutual Ins. Co., 162 F.3d 410, 419 (6th Cir. 1998)). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." Fallick, 162 F.3d at 419. A plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision. Coomer, 370 F.3d at 505. The administrative futility doctrine has been applied in two scenarios: (1) when the plaintiff's suit is directed to the legality of the plan, not to a mere interpretation of it; and (2) when the defendant lacks the authority to make the decision sought by plaintiff. Dozier v. Sun Life Assurance Co. of Canada, 466 F.3d 532, 535 (6th Cir. 2006). Neither of those two scenarios is present in the instant case. However, this case does present unusual circumstances.

The Plan required that an appeal from an adverse benefit determination be filed within 180 days. The adverse benefits determination was issued by Aetna on November 11, 2011. Therefore, plaintiff's notice of appeal was due by May 7, 2012. A letter to

plaintiff's counsel from Aetna dated June 29, 2012, stated that plaintiff's appeal request was received on May 16, 2012.  AR 292. However, the record also includes a letter from counsel dated April 11, 2012, in which counsel requested a thirty-day extension to submit an official appeal, claiming that the request was based in large part on Aetna's failure to acknowledge counsel's December 19, 2011, letter requesting a copy of the applicable LTD policy manual to assist him in preparing the appeal.  AR 784.  This letter raises the issue of whether the delay in filing the appeal may have been due in part to Aetna's delay in furnishing plan documents.  The record contains no correspondence from Aetna expressly granting the thirty-day extension, but, by the same token, the June 29, 2012, letter acknowledging the receipt of plaintiff's appeal said nothing about the appeal being late.  Rather, the letter stated that plaintiff's records were being referred to an independent examiner for review.  AR 292.  Aetna heard plaintiff's appeal on the merits and rendered a decision by letter dated August 9, 2012.  AR 298. The final decision letter also makes no mention of the appeal being untimely.  Thus, it could be argued that Aetna implicitly granted counsel's request for an extension.

The court concludes that defendants waived the time limitations and implicitly granted an extension by considering the appeal on its merits.  Even assuming that untimely exhaustion argument has not been waived, plaintiff effectively exhausted her administrative remedies because Aetna addressed her appeal on the merits, and Aetna has presented an administrative record adequate for review by this court, thus satisfying the purposes underlying the exhaustion requirement.  Defendants' request for judgment based

on the alleged untimeliness of plaintiff's appeal is denied.

III. Dismissal of Aetna as a Party

Aetna moves to be dismissed as a party, noting that Cox Enterprises is the Plan administrator, and that Aetna is just the claims administrator. However, under the terms of the Administrative Services Contract, Cox Enterprises delegated to Aetna the authority to make determinations on behalf of Cox with respect to benefit payments under the Plan. AR 965, 971. The Sixth Circuit has held that "when an insurance company administers claims for employee welfare benefit plans and has authority to grant or deny claims, the insurance company is a 'fiduciary' for ERISA purposes" and is a "proper party defendant for a denial of benefits claim by Plaintiff." Moore v. Lafayette Life Ins. Co., 458 F.3d 416, 438 (6th Cir. 2006). Aetna is a proper party defendant in this case, and Aetna's motion for judgment on this ground is denied.

IV. Aetna's Initial Decision to Deny Benefits

A. Report of Dr. Joseph Rea, M.D.

In deciding plaintiff's claim for continuing LTD benefits, Aetna arranged for a review of plaintiff's file by an independent medical examiner, Joseph Rea, M.D., board-certified in occupational medicine. In a report dated October 14, 2011, Dr. Rea described his review of plaintiff's file and his conclusions. AR 640-644. In regard to the treatment records of Dr. Phillip Stern, plaintiff's internist, Dr. Rea noted that:

> - plaintiff had been treated by Dr. Stern for back pain since May 1, 2009, with pain medication and muscle relaxers, and Dr. Stern had referred her to a pain management clinic for treatment of fibromyalgia and back pain;

- an April 30, 2010, attending physician statement of Dr. Stern reported a diagnoses of fibromyalgia, herniated disk, depression and anxiety. [Dr. Stern stated that plaintiff reported constant pain and burning in both legs, as well as generalized muscle and joint pain, and that she was unable to sit or stand for more than twenty to thirty minutes. See AR 373-74];

- Dr. Stern opined in an attending physician statement dated November 30, 2010, that plaintiff's fibromyalgia, herniated disc, spastic bladder, and depression permanently prevented her from returning to work. See AR 394-395; and

- Dr. Stern described plaintiff's physical limitations in an attending physician statement dated May 4, 2011, and opined that plaintiff could never return to work. [Dr. Stern indicated that plaintiff could never climb, crawl, lift, pull, push, carry, engage in firm hand grasping, fine or gross manipulation, repetitive motion and stooping; that she could occasionally kneel, reach forward and above her shoulder, bend and twist, engage in hand grasping, sitting, standing and walking, lifting up to ten pounds; that she could operate a motor vehicle but not hazardous machinery or power tools; and that she had no exposure limitations to heat, cold, dampness, noise, dust, fumes, chemicals or radiation. See AR 406-408].

Dr. Rea also reported that when he spoke with Dr. Stern in a peer-to-peer consultation on October 10, 2011, Dr. Stern stated that he would leave any assessment regarding plaintiff's restrictions and limitations up to her pain specialist. AR 642.

Dr. Rea commented on the records of Dr. Anapuma Chauhan, plaintiff's rheumatologist. Dr. Rea noted that:

- plaintiff had been diagnosed with fibromyalgia by Dr. Chauhan and was being treated by him with medication and injections;

- the July 20, 2009, office notes of Dr. Chauhan reported that plaintiff was doing well in general, and that her medications were continued. See AR 344; and

- plaintiff saw Dr. Chauhan on March 2, 2011, and was diagnosed as having bilateral carpal tunnel syndrome.

10

> Plaintiff was advised to try carpal tunnel wrist braces, and physical therapy for back pain was prescribed. <u>See</u> AR 450. Plaintiff was seen again on June 14, 2011, and she reported that she had not been able to get wrist braces for carpal tunnel syndrome. A physical exam on that date showed normal gait and joints, but that tender points suggesting fibromyalgia were present.

Dr. Rea reported that he spoke with Dr. Chauhan on October 11, 2011. Dr. Chauhan stated that she believed that plaintiff's fibromyalgia itself was not disabling, and that plaintiff had mild spinal stenosis and mild carpal tunnel syndrome, for which no surgery had been performed. Dr. Chauhan had no specific opinion on plaintiff's restrictions or limitations. AR 642-43.

Dr. Rea observed that plaintiff saw Dr. Zhanna Mikulik, a rheumatologist, on August 8, 2009, complaining of shoulder pain. She was diagnosed as having bursitis, and received an injection. AR 641. [Dr. Mikulik reported that his physical examination of plaintiff revealed that she had a full range of motion in all her joints, and was not in acute distress, that her shoulder was injected with no complications, and that her shoulder pain was improved with medication. <u>See</u> AR 344].

Dr. Rea noted an MRI of plaintiff performed on October 2, 2009, which showed a shallow disc protrusion at one level without significant central canal stenosis or neural foraminal narrowing, and some degenerative facet arthropathy with no significant encroachment effect. <u>See</u> AR 359-60, 641. Dr. Rea also commented on a neurology evaluation and an EMG on October 11, 2010, by Dr. Erick A. Arce, a neurologist. Dr. Arce's examination of plaintiff showed chronic mild motor lumbosacral radiculitis, diminished sensation in the left arm, and decreased pinprick at the left lower extremity, but was otherwise unremarkable. AR 641. In his report,

Dr. Arce stated that there was no medical explanation for plaintiff's symptoms and that neuropathy was unlikely. See AR 392, 641. [The record also includes a letter dated May 28, 2010, written by Dr. Nancy M. Vaughan regarding an MRI of plaintiff's sacrum. Dr. Vaughan noted that the MRI was unremarkable, with no significant disc protrusion, and stated, "I am at a loss to explain her intense pain." See AR 389].

In a letter to Aetna dated May 4, 2011, plaintiff stated, "I don't believe that my mental health is an issue regarding my disability claim." AR 415. Nonetheless, Dr. Rea reviewed the office visit notes of Dr. Mahmoud Shehata, plaintiff's psychiatrist. AR 641. Dr. Shehata diagnosed plaintiff as having recurrent major depression, and prescribed medication. AR 642. [Dr. Shehata's initial treatment note on February 12, 2010, stated that plaintiff denied suicidal or homicidal ideations or hallucinations; her thoughts were logical, coherent, and goal directed; she was alert and oriented to time, place, and person; she appeared to have good insight and judgment; she was able to recall two objects out of three in five minutes; and her general fund of knowledge was good. See AR 462-463].

Dr. Rea also considered plaintiff's activities of daily living questionnaire, in which plaintiff described her limitations, including her inability to drive long distances and sleep disruption. Plaintiff also reported that she was unable to fix food because of the standing involved, which resulted in pain, and that she depended on her husband to perform chores around the house. See AR 465-469, 642.

Dr. Rea concluded that there was no support for any physical

functional impairment sufficient to meet the "any occupation" disability standard. AR 643. He noted that the only exam findings corroborating plaintiff's impairments of low back pain from degenerative disc disease, mild bilateral lumber radiculitis, and mild bilateral carpal tunnel syndrome were a previous lumbar MRI (referring to the October 2, 2009, MRI which showed a shallow central disc protrusion and some degenerative facet arthropathy without significant central canal stenosis or neural foraminal narrowing, see AR 259-60), and electrodiagnostic studies (referring to an EMG report showing chronic mild motor lumbosacral radiculitis at one point bilaterally, see AR 392). AR 643. Based on the records he reviewed, Dr. Rea also listed restrictions which he felt might be appropriate in light of plaintiff's degenerative disc disease. AR 643. He indicated that the estimated physical demand level of work that plaintiff could perform would fall into the sedentary category. AR 644.

B. Transferable Skills and Labor Market Analyses

Based on Dr. Rea's report, Aetna obtained a transferable skills analysis and a labor market analysis from Coventry Health Care ("Coventry"). AR 628-639. Coventry considered Dr. Rea's report, an education and work history questionnaire completed by plaintiff, and information obtained during a telephone interview with plaintiff on October 25, 2011. AR 628, 636. Taking into account the limitations assessed by Dr. Rea, Coventry identified a non-exhaustive list of five sedentary-level occupations within a one-hundred-mile radius of plaintiff's home which were good matches for plaintiff's sedentary restrictions and transferable skills. AR 639.

C. Aetna's Decision Letter

By letter dated November 11, 2011, Aetna notified plaintiff that her LTD benefits would be terminated on November 13, 2011. Aetna determined that plaintiff did not meet the "any occupation" definition of total disability, which required that she was "not able, solely because of injury or disease, to work at any reasonable occupation," defined as "any gainful activity for which you are, or may reasonably become, fitted by education, training or experience." AR 491. Aetna indicated that it had reviewed the records of Drs. Stern, Arce, Chauhan, and Shehata. AR 492. The letter advised that "our clinical consultants as well as our behavioral health consultants concluded that the medical information does not support your inability to work due to physical or psychological limitations." AR 492. The letter further referenced the review of plaintiff's records by Dr. Rea, noting in particular that when Dr. Rea spoke with Drs. Stern and Chauhan, "no specific restrictions or limitations with respect to work were indicated by either doctor." AR 492. The letter noted that Dr. Rea's report "indicated there is no clinical evidence on exam or radiographically that would restrict you from working in a full time, sedentary occupation." AR 492. Aetna also referred to Coventry's reports which identified five jobs which plaintiff could engage in given her physical capabilities and restrictions, noting that "these occupations would not require you to perform any activities that you are medically restricted from performing[.]" AR 492-493. Aetna also acknowledged that plaintiff had been approved for social security disability benefits. See decision of the administrative law judge finding that plaintiff was disabled as

14

of April 30, 2009, and was entitled to disability benefits, at AR 416-425. However, Aetna stated that this determination was not entitled to significant weight, noting that: social security determinations are driven by Social Security Administration ("SSA") regulations as opposed to the Plan definition of disability; the evidence relied on in awarding social security benefits and the basis for that determination had not been provided to Aetna; and Aetna may have had different evidence. AR 493.

V. Plaintiff's Appeal

A. Report of Dr. Leonard Schnur

On appeal, plaintiff provided additional medical records to Aetna. These records included: additional treatment records and a physical capacity evaluation from Dr. Stern; treatment records from Chauhan; a report from Dr. Michael Orzo; the treatment records and a chronic pain residual functional capacity questionnaire from Dr. Sachida N. Manocha, a pain specialist; treatment records and a mental impairment questionnaire from Bonita C. Beardslee, a nurse practitioner, concerning psychological counseling; treatment records from Dr. Bruce L. Hennessy; and reports concerning MRI's of the lumber and thoracic spine performed on September 13 and 15, 2011.

Aetna arranged for plaintiff's records to be reviewed by Dr. Leonard Schnur, Psy.D., a board-certified psychologist. In his report of July 10, 2012, AR 538-541, Dr. Schnur described his review of the records of plaintiff's psychiatrist, Dr. Shehata, who diagnosed plaintiff as having major depressive disorder. Dr. Schnur noted that Dr. Shehata did not provide any formal measurements of cognitive or emotional functioning to substantiate

15

the presence of a functional impairment.  AR 539.

Dr Schnur also reviewed the office notes of Bonita Beardslee, a nurse practitioner dated March 21, 2012, and April 10, 2012, noting, at AR 540 that:

> - Ms. Beardslee evaluated plaintiff as having depressive disorder and anxiety disorder, with anhedonia and poor concentration, but noted no formal measurements of cognitive or emotional functioning; and
>
> - Ms. Beardslee completed a mental impairment questionnaire dated April 12, 2012, which referred to plaintiff's history of depression and anxiety. AR 725-727. Ms. Beardslee noted that plaintiff was alert with no cognitive impairment. Although Ms. Beardslee provided a checklist of plaintiff's symptoms, no formal measurements of cognitive or emotional functioning were administered. Ms. Beardslee indicated that she was unable to determine plaintiff's prognosis, as she had only seen her twice, but that in light of plaintiff's decreased energy, persistent anxiety, mood disturbances, and difficulty thinking and concentrating, plaintiff would be unable to meet standards in three aspects of unskilled work. See AR 726-27.

Dr. Schnur spoke with Ms. Beardslee on July 5, 2012. Ms. Beardslee stated that plaintiff had been improving through a combination of medication and therapy, and that she should have been able to return to work from a psychiatric standpoint. Ms. Beardslee confirmed that no formal measurements of cognitive or emotional functioning were administered to substantiate the presence of a functional impairment from a psychological standpoint. AR 540-41.

Dr. Schnur concluded that there was a lack of examination findings to substantiate a functional impairment across cognitive, emotional and behavioral spheres which would preclude plaintiff from performing the work of any occupation, and that the records also did not substantiate the presence of any adverse medication effects impacting functionality from a cognitive or physical

standpoint.  AR 541.

B. Report of Dr. Rubin Stuart

Aetna also obtained a review of plaintiff's records by Dr. Rubin Stuart, M.D., who is board-certified in physical medicine and rehabilitation.  In his report at AR 530-533, Dr. Rubin commented on plaintiff's medical records, including:

- an MRI on October 18, 2010, which revealed "very mild degenerative changes at multiple levels" with "no canal stenosis or neuroforminal encroachment, AR 390-391;

- an MRI on September 15, 2011, which revealed mild degenerative disk disease and facet degenerative changes in the thoracic spine and some foraminal narrowing in the cervical spine.  [Dr. Matthew M. Wagner, M.D., who analyzed the MRI, stated that there was likely some foraminal narrowing in the cervical spine at C4-C5 and recommended an MRI of the cervical spine.  See AR 772-773.  The record does not show that any cervical MRI was performed.];

- the November 7, 2011, report of Dr. Michael Orzo, M.D., in which Dr. Orzo noted that the September 15, 2011, MRI showed mild degenerative disc disease, three minor disc bulges without canal stenosis or foraminal narrowing.  AR 766.  Dr. Orzo observed that plaintiff was sitting uncomfortably, had mild pain with facet loading and extension at the waist, and tenderness in the bilateral piriformis regions, and demonstrated a negative straight leg raise in the sitting position at ninety degrees.  [However, flexion at the waist and sensation and strength throughout the lower extremities were within normal limits.  Dr. Orzo commented that "it is difficult to determine the exact etiology for the patient's pain."  See AR 767];

- the attending physician statement of Dr. Stern dated May 4, 2011, see AR 405-408, noting that plaintiff had no ability to work;

- the December 22, 2011, physical capacity evaluation completed by Dr. Stern, see AR 740-742, indicating that plaintiff could work zero to three days per week and less than three consecutive weeks per month, that plaintiff

17

had a mental impairment hindering her ability to understand, remember and carry out simple instructions, that plaintiff should never stoop, and could sit fifteen minutes and stand fifteen minutes;

- the office notes of Dr. Chauhan, plaintiff's rheumatologist, for February 27, 2012, documenting an office visit for fibromyalgia syndrome, see AR 743-45, which did not document any physical examination;

- the April 12, 2012, mental impairment questionnaire, see AR 725-727, completed by Ms. Beardslee, which noted that plaintiff's impairment could be expected to last at least twelve months;

- a chronic pain residual functional capacity questionnaire dated May 2, 2012, see AR 735-738, completed by Dr. Sachida Manocha, M.D., plaintiff's pain specialist, which indicated that plaintiff could occasionally lift up to ten pounds and would have significant limitations reaching, handling, and fingering; and

- a record indicating that plaintiff had a lumbar epidural injection in May or June of 2012, with the stated diagnosis being chronic pain syndrome, with disc degeneration, cervicalgia, thoracic/lumbosacral neuritis/radiculitis, myalgia and myositis, but no physical exam findings were given.

Dr. Rubin attempted to speak to Dr. Manocha and Dr. Stern by telephone and left his call-back information with their offices, but his calls were apparently not returned. AR 532.

Dr. Rubin concluded that the plaintiff's functional impairments were not supported by the record. He stated that it was unclear why plaintiff's doctors had indicated that she is unable to work, as, although her doctors had assigned restrictions, there were no physical examination notes supporting the functional impairments. AR 532. Dr. Rubin opined that plaintiff was not precluded from working at a sedentary level. AR 532. Dr. Rubin also reported that although no adverse medication effects were

18

noted, it appeared that plaintiff had cognitive issues reportedly related to fibromyalgia, and that because she was on Percocet and other medications which might have cognitive side effects, she should be monitored while operating machinery, driving, balancing, or assuming unguarded heights.  AR 533.

C. Report of Dr. Tamara Bowman

Aetna also obtained a review of plaintiff's file by Dr. Tamara Bowman, M.D., who is board-certified in internal medicine.  In her report dated July 10, 2012, see AR 548-554, Dr. Bowman stated that plaintiff had a long history of low back pain as well as generalized muscle pain diagnosed as fibromyalgia, noting:

- the MRI results of October 2, 2009, which revealed a shallow central disk protrusion without significant central canal stenosis or neural foraminal narrowing and some degenerative facet arthropathy with a synovial cyst, see AR 359-60;

- plaintiff's treatment in August of 2009 for bursitis, at which time plaintiff demonstrated a full range of motion of all joints on examination, see AR 344;

- the October 11, 2010, evaluation by neurologist Dr. Erick Arce, where plaintiff exhibited diffuse hyperreflexia without upper motor neuron signs, diminished sensation to temperature in the left arm, and increased sensation to pin prick in the left lower extremity; however, Dr. Arce indicated that there was no neurological explanation for plaintiff's symptoms, see AR 392;

- an MRI of the thoracic spine on October 18, 2010, which revealed only very mild degenerative changes with no evidence of canal stenosis, neural foramen encroachment, or focal disk protrusion or herniation at any level, see AR 390-91;

- an MRI of the lumbar spine on September 15, 2011, which revealed minor disk bulges and facet degenerative changes but no evidence of canal stenosis or foraminal narrowing; an MRI of the thoracic spine on that same date revealed

degenerative disk disease, <u>see</u> AR 772;

- Dr. Stern's office records, where the only discernable clinical findings were plaintiff's blood pressure and weight. These records included Dr. Stern's attending physician's statement dated May 4, 2011, <u>see</u> AR 405-408, in which he stated that he did not expect plaintiff to ever return to work, noting the diagnoses of fibromyalgia and degenerative disk disease, and indicated that plaintiff could only sit and stand occasionally, and was unable to perform fine manipulations with her hands, but provided no documentation of clinical findings; and the attending physician's statement completed on December 22, 2011, by Dr. Stern, <u>see</u> AR 740-42, noting plaintiff's restrictions;

- the June 14, 2011, record of a physical exam of plaintiff by Dr. Chauhan which showed evidence of tender points consistent with fibromyalgia; however, plaintiff had full range of motion at all joints and a normal gait. <u>See</u> AR 768-770. [Dr. Chauhan noted that he did not observe any joint deformity, heat, swelling, erythena, or effusion in the shoulders, elbows and hands and that the "problem is stable." <u>See</u> AR 768, 770.];

- the February 27, 2012, record of plaintiff's appointment with Dr. Chauhan, at which time plaintiff complained of shoulder, hip and low back pain, fatigue, blurred vision, paresthesias, weakness, morning stiffness and headache; no physical exam findings were documented to support functional impairment. <u>See</u> AR 743-45. [The report was negative for extremity weakness, gait disturbance, joint swelling, limping, or memory impairment. <u>See</u> AR 743-45.];

- a physical examination of plaintiff by Dr. Michael Orzo, a pain management specialist, who evaluated plaintiff on November 7, 2011, for lower extremity and back pain. <u>See</u> AR 766-767. On physical examination, Dr. Orzo noted that plaintiff appeared to sit uncomfortably during the interview and shifted her weight frequently. However, plaintiff: had only mild pain in the facet regions with extension at the waist to ten to fifteen degrees; flexion at the waist was within normal limits; sensation and strength in her lower extremities was normal; had negative straight leg raise in the sitting position at ninety degrees with negative dural tension signs bilaterally; and had some tenderness to palpation

20

in the bilateral piriformis regions. Dr. Orzo concluded that plaintiff had some piriformis syndrome with a possible neuropathic component in the lower extremities. See AR 767;

- the records of Dr. Bruce Hennessy, a gastroenterologist, who saw plaintiff on February 3, 2012, for complaints of abdominal pain. Her physical exam was completely normal. She had a normal range of motion in her neck; no abdominal tenderness; normal gait, range of motion and strength; no depression or anxiety; and was oriented to time, space and person. See AR 755-757. Plaintiff underwent a colonoscopy on February 21, 2012. A benign polyp was removed during the procedure, and there was some diverticulosis and internal hemorrhoids, but no evidence of diverticulitis. See AR 749-52. An upper endoscopy that same date revealed some evidence of gastritis and grade B esophagitis consistent with mild chronic inflammation due to gastroesophageal reflux. See AR 751-52; and

- the records of Dr. Sachida Manocha, a pain management specialist who saw plaintiff on five occasions and prescribed medication for fibromyalgia; however, no physical examination findings were documented at these visits with the exception of plaintiff's blood pressure, which was unremarkable. See AR 697-704, 711, 715, 708. On April 4, 2012, plaintiff complained to Dr. Manocha about numbness in her left arm, but this was not substantiated on physical exam, and Dr. Manocha noted that plaintiff "SEEMS OK.". See AR 703-704. Dr. Manocha completed a chronic pain residual functional capacity questionnaire on May 2, 2012, describing plaintiff's physical limitations. See AR 551, 735-738. [Dr. Manocha's assessment of plaintiff's functional limitations differed from Dr. Stern's in some respects, in that Dr. Stern noted that plaintiff could only occasionally reach, handle or finger, see AR 741-42, whereas Dr. Manocha opined that plaintiff could grasp, turn, or twist objects or engage in fine finger manipulations for eighty percent of the work day. See AR 738.] During a visit on June 6, 2012, plaintiff stated that she was feeling much better and Dr. Manocha noted that she "SEEMS OK." See AR 697-701.

Dr. Bowman stated in her report that she attempted to speak

21

with Dr. Stern on July 2, 2012.  Dr. Bowman informed Dr. Stern's assistant that she needed to ask Dr. Stern about his physical exam findings, if any, which were made during plaintiff's visits, and whether he felt plaintiff could perform at least at the sedentary level.  Dr. Bowman spoke with Dr. Stern's assistant on July 5, 2012, who indicated that Dr. Stern had seen plaintiff on five occasions between November 13, 2011, and July 15, 2012. Plaintiff's visit on June 1, 2012, was for carpal tunnel symptoms, but no actual abnormalities were documented on physical exam, and plaintiff was referred to a pain management specialist.  The assistant also relayed Dr. Stern's opinion that plaintiff would be unable to perform sedentary work due to her back and leg pain and carpal tunnel symptoms.  However, the assistant was unable to provide any physical exam or clinical findings to support functional impairment.  AR 552.

Dr. Bowman concluded in her report that there were insufficient clinical findings, physical exam findings, lab abnormalities, or diagnostic study results to support a level of functional impairment that would preclude sedentary work.  AR 552-553.  She noted that although plaintiff had a long history of back and leg pain, the imaging studies showed no evidence of central canal stenosis or neural foraminal impingement, and there was no documentation on physical examination of any signs of neural compression resulting in a functional deficit that would preclude work at a sedentary physical demand level.  AR 552.  Dr. Bowman further observed that the only documentation of decreased range of motion was during the November 7, 2011, consultation with Dr. Orzo, where plaintiff was noted to have mild pain in the facet regions upon extension of ten to fifteen degrees at the waist; otherwise,

22

Dr. Orzo found that plaintiff's sensation and strength in her lower extremities were within normal limits.  AR 553.  Dr. Bowman also commented that there was no documentation of abnormal gait, and that, although Dr. Manocha referred to muscle spasm, weakness and atrophy, swelling, abnormal posture and gait, and sensory changes in the functional capacity questionnaire, there was no documentation of any of these on physical examination, and no documentation of joint deformity or effusion, or signs of swelling, redness or warmth.  AR 553.  Dr. Bowman further noted that, according to plaintiff's rheumatologist, there was no evidence of inflammatory arthritis, and there was also no documentation of lupus or joint connective tissue disease, of positive serologic markers of inflammation, of neurologic exam abnormalities involving the upper extremities, or of signs of carpal tunnel syndrome supported by electrodiagnostic studies.  Dr. Bowman reiterated that Dr. Stern provided no additional clinical findings to support a functional deficit that would preclude sedentary work.  AR 553.  Dr. Bowman concluded that plaintiff should be able to perform at a sedentary physical demand level.  AR 553.  She also noted that there was no documentation of adverse effects from medications, and that although there were references to plaintiff having some cognitive impairment, there was no documentation based on mental status examination or formal neuropsychological testing to support cognitive impairment.  AR 554.

D. Aetna's Decision on Appeal

By letter dated July 27, 2012, Aetna advised Dr. Stern of the results of the independent review and attached copies of the reports of Drs. Rubin and Bowman.  Aetna invited Dr. Stern to review the reports, to indicate if he disagreed with any of the

reviewers' conclusions, and to provide any clinical evidence or observations which had not yet been provided.  AR 562-575.  A similar letter was sent to Dr. Manocha, with a copy of Dr. Rubin's report.  AR 577-583.  That same date, Aetna also sent a letter to plaintiff's counsel informing him that the reports had been sent to Drs. Stern and Manocha, inviting their comments.  AR 296.  Aetna received no responses to this correspondence.

By letter dated August 9, 2012, Aetna advised plaintiff that the decision to terminate benefits had been upheld.  AR 298-302. The letter stated that:

- plaintiff's file was reviewed by independent peer physicians, and that the reports were sent to Drs. Stern and Manocha for comments, but no response was received;

- records from Dr. Shehata were reviewed, but that Dr. Shehata did not provide any formal measurements of cognitive or emotional functioning to substantiate the presence of a functional impairment;

- the records of Dr. Chauhan outlined plaintiff's complaints, but no physical exam findings were documented;

- the records from Nurse Practitioner Beardslee described plaintiff's history of anxiety, depression, and fibromyalgia, but no formal measurements of cognitive or emotional functioning were documented to substantiate the presence of a functional impairment.  In a peer-to-peer teleconference, Ms. Beardslee indicated that plaintiff had been improving through a combination of medication and therapy; that she appeared to be stable; that plaintiff should have been able to return to work from a psychiatric standpoint; and that no formal measurements of cognitive or emotional functioning were administered;

- an MRI on September 15, 2011, revealed mild degenerative disk disease and facet degenerative changes, with some foraminal narrowing on the cervical spine in one area;

- although Dr. Stern completed a physical capacity

24

evaluation on December 22, 2011, his assistant confirmed that she was unable to provide any physical examination findings or additional clinical findings to support functional impairment, and that no abnormalities indicating carpal tunnel syndrome were documented on physical exam;

- although Dr. Manocha completed a chronic pain residual functional capacity questionnaire on May 2, 2012, no physical exam findings were documented at plaintiff's office visits;

- that a transferrable skills analysis and labor market survey completed by a vocational specialist identified occupations within a sedentary exertion level which plaintiff could perform; and

- although plaintiff had been awarded social security benefits on May 10, 2011, since that time, Aetna had received updated medical records, obtained a review of those records by qualified medical consultants and obtained the transferable skills and labor market analyses.

Aetna determined that plaintiff was no longer disabled under the terms of the Plan.  Aetna concluded that there was no evidence on imaging studies of any central canal stenosis or neural foraminal impingement, and no documentation on physical examination of any signs of neural compression that have resulted in a functional deficit that would preclude work at a sedentary physical demand level.  Aetna noted that while there was some documentation of decreased range of motion and decrease in pinprick sensation prior to the appeal period, there was no documentation of any focal sensory examination findings; abnormal gait; joint deformity or effusion; any signs of synovitis, such as swelling, redness or warmth; inflammatory arthritis, lupus or connective tissue disease; neurologic exam abnormalities involving the upper extremities; electrodiagnostic studies supporting a diagnosis of carpal tunnel

25

syndrome; or formal measurements of cognitive or emotional functioning which would support a functional impairment. AR 300. Aetna concluded that there was insufficient medical evidence to support plaintiff's disability and the November 11, 2013, decision to terminate LTD benefits was upheld. AR 301.

VI. Review of Aetna's Decision

In reviewing Aetna's decision to deny plaintiff's application for continued LTD benefits, this court applies the arbitrary and capricious standard of review. Review under the arbitrary and capricious standard is "extremely deferential." McClain v. Eaton Corp. Disability Plan, 740 F.3d 1059, 1064 (6th Cir. 2014). "Review under the arbitrary and capricious standard is the least demanding form of judicial review of an administrative action; it requires only an explanation based on substantial evidence that results from a deliberate and principled reasoning process." Morrison, 439 F.3d at 300; see also Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003)("When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."); Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000)(if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious). This is true regardless of whether an equally rational interpretation is offered by the plan participant. Gismondi v. United Techs. Corp., 408 F.3d 295, 298 (6th Cir. 2005). "The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was 'rational.'" Schwalm v. Guardian Life Ins. Co. of America, 626

26

F.3d 299, 308 (6th Cir. 2010). In reviewing the administrator's decision, the court's review is limited to the administrative record which was before the plan administrator at the time of the benefit determination. <u>Schwalm</u>, 626 F.3d at 308.

A district court's obligation to review the administrative record "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues" to avoid becoming "nothing more than rubber stamps for any plan administrator's decision." <u>McDonald v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161, 172 (6th Cir. 2003). However, although "the standard is not without some teeth, it is not all teeth." <u>McClain</u>, 740 F.3d at 1064 (noting that "an 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision").

Plaintiff argues that Aetna should have obtained a doctor to conduct a physical examination of the plaintiff. However, nothing in the Plan language requires Aetna to obtain a physical examination of the plaintiff to bolster plaintiff's disability claim. Rather, the Plan places the burden on the participant to furnish proof that the participant is still totally disabled. AR 809-10. Further, the records reviewed by the independent medical examiners were records provided by plaintiff's treating physicians who did personally interact with plaintiff. Four independent medical examiners qualified in different relevant specialties thoroughly reviewed the records of plaintiff's treating physicians. The Plan's use of these examiners was not arbitrary and capricious.

Plaintiff argues that the denial of benefits was arbitrary and capricious because Aetna gave more weight to the opinions of the reviewing examiners than to those of plaintiff's treating

physicians.    Generally,  a  plan  may  not  summarily  reject  the
opinions  of  a  participant's  treating  physician,  and  must  give
reasons  for  adopting  an  alternative  opinion.    Elliott v. Metro.
Life Ins., 473 F.3d 613, 620 (6th Cir. 2006).    However, a plan
administrator  is  not  required  to  accord  special  weight  or  deference
to  the  opinions  of  the  plaintiff's  treating  physician.    Balmert v.
Reliance  Standard  Life  Ins.  Co., 601  F.3d  497,  504  (6th  Cir.
2010)(citing Black & Decker Disability Plan v. Nord, 538 U.S. 822,
831  (2003)); Calvert v. Firstar Finance, Inc., 409 F.3d 286, 293
(6th  Cir.  2005)("treating  physician  rule"  does  not  apply  in  the
ERISA  context).    "Reliance  on  other  physicians  is  reasonable  so
long  as  the  administrator  does  not  totally  ignore  the  treating
physician's  opinions."  Balmert, 601 F.3d at 504.

A  plan  administrator  can  resolve  conflicts  between  the
opinions  of  plaintiff's  treating  physicians  and  the  opinions  of  its
own  file  reviewers  if  it  provides  reasons,  such  as  the  lack  of
objective  evidence,  for  adopting  the  alternative  opinions.  Curry,
400  F.App'x  at  60.    "Generally,  when  a  plan  administrator  chooses
to  rely  upon  the  medical  opinion  of  one  doctor  over  that  of  another
in  determining  whether  a  claimant  is  entitled  to  ERISA  benefits,
the  plan  administrator's  decision  cannot  be  said  to  have  been
arbitrary  and  capricious[.]"  McDonald, 347 F.3d at 169.    A plan
administrator  does  not  act  arbitrarily  and  capriciously  in  relying
on  the  conclusions  of  independent  medical  examiners  while  rejecting
the  opinions  of  the  claimant's  treating  physicians  if  the
administrator  provides  its  reasons,  based  upon  the  medical
reviewers'  opinions,  for  doing  so.  See Curry, 400 F.App'x at 60-
65.

Here,  the  reviewing  physicians  did  not  ignore  or  overlook

28

medical records, nor did they ignore the physical capacity questionnaires completed by plaintiff's treating physicians. In fact, the physical restrictions and limitations proposed by Dr. Rea in his report, resulting in his opinion that plaintiff's physical demand level would fall within a sedentary (the lowest possible) level, are not significantly different from the restrictions imposed by Dr. Stern. See AR 405-408, 643. Rather, the independent medical examiners concluded that although there was some clinical support for the diagnoses of mild disc degenerative disease and carpal tunnel syndrome, the records lacked findings based on physical examination or laboratory and diagnostic tests sufficient to support physical and mental functional impairments which would preclude plaintiff from doing sedentary work. Having reviewed the administrative record, the court finds that this conclusion is supported by the evidence. The independent examiners adequately explained their reasons for disagreeing with the conclusion of Dr. Stern that plaintiff was unable to work even at a sedentary level, and Aetna's decision to adopt the opinions of the independent examiners was not arbitrary and capricious.

Contrary to plaintiff's arguments, the independent examiners made no credibility determinations regarding plaintiff's complaints of pain and symptoms. Rather, their opinions that plaintiff is capable of sedentary work were based on the lack of objective clinical evidence to support the physical and mental capacity evaluations completed by plaintiff's treating physicians. A lack of objective medical evidence upon which to base a treating physician's opinion is sufficient reason for an administrator's choice not to credit that opinion. Boone v. Liberty Life Assur. Co. of Boston, 161 F.App'x 469, 473 (6th Cir. 2005). "Requiring a

claimant to provide objective medical evidence of disability is not irrational or unreasonable," even when such a requirement does not appear among the plan terms.  Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 166 (6th Cir. 2007).  For example, the Sixth Circuit has held that it is reasonable for a plan to require objective evidence of functional limitations resulting from fibromyalgia. Unit v. Metropolitan Life Ins. Co., 587 F.App'x 860, 862 (6th Cir. 2014).

Plaintiff cites the MRI evidence.  However, the October 2, 2009, lumbar spine MRI showed only a shallow disc protrusion and degenerative facet arthropathy without significant central canal stenosis or neural foraminal narrowing.  AR 359-60.  The October 18, 2010, MRI showed minimal disc space narrowing with minimal circumferential bulge and mild degenerative changes with no canal stenosis or neural foramen encroachment.  AR 390-391.  A May 28, 2010, MRI of plaintiff's sacrum was unremarkable.  AR 389.  Lumber and thoracic spine MRI's  performed on September 13 and 15, 2011, revealed mild degenerative disc disease, but no appreciable canal stenosis and minor scoliosis.  AR 773.  The conclusion of the independent examiners that these clinical findings do not indicate functional impairments that would preclude plaintiff from engaging in sedentary work is further supported by the fact that three of plaintiff's treating physicians who reviewed these MRI results indicated that they furnished no clinical explanation for plaintiff's symptoms of intense pain.  See May 28, 2010, letter of Dr. Vaughan AR 389; October 11, 2010, letter of Dr. Arce AR 392; November 7, 2011, letter of Dr. Orzo AR 767.  The independent examiners also correctly noted that what little was in the record in the way of physical exam findings also did not support the

30

functional impairment determinations of Drs. Stern and Manocha. Aetna did not act arbitrarily and capriciously in relying on the opinions of the independent reviewers that the MRI results did not provide a basis for the severe physical limitations imposed by Drs. Stern and Manocha.

Likewise, Aetna did not act arbitrarily and capriciously in relying on the report of Dr. Schnur. Although Dr. Schnur did not interview plaintiff, he thoroughly reviewed the records of plaintiff's psychiatrist, Dr. Shehata, and Ms. Beardslee, a nurse practitioner who was counseling plaintiff. Dr. Schnur concluded that the record lacked sufficient examination findings or formal measurements of cognitive or emotional functioning to substantiate the presence of a mental functional impairment. AR 541. In addition, Dr. Schnur spoke with Ms. Beardslee, who verified that no formal measurements of cognitive or emotional functioning were administered. AR 540. Ms. Beardslee also indicated that plaintiff appeared improved and stable and should have been able to return to work from a psychiatric standpoint. AR 540. As indicated above, Aetna was not required to arrange for Dr. Schnur to conduct a psychological evaluation of plaintiff; rather, it was plaintiff's burden to produce evidence showing that she was disabled.

The court also notes that the offices of Drs. Stern and Manocha were contacted to determine if they had any additional documentation regarding clinical tests, physical exam findings, or reports of formal measurements of cognitive functioning. AR 532, 552. Drs. Stern and Manocha were given the opportunity to respond to the examiners' reports stating that the work restrictions proposed by them were not supported by clinical tests prior to Aetna making its final decision on the appeal, and plaintiff's

31

counsel was notified that the reports were being sent to them. Thus, plaintiff had a fair opportunity to respond to the conclusions of the independent examiners, but failed to do so.

The record indicates that plaintiff has been awarded social security disability benefits. However, an ERISA plan is not bound by the SSA's decision that a participant was disabled. Combs v. Reliance Standard Life Ins. Co., 511 F.App'x 468, 472 (6th Cir. 2013); Calvert v. Firstar Fin., Inc., 409 F.3d 286, 294 (6th Cir. 2005). A plan administrator's failure to address the finding of the SSA can render the denial of further LTD benefits arbitrary and capricious. Calvert, 409 F.3d at 295. However, Aetna adequately explained why it was not giving significant weight to the SSA's award of social security disability benefits, and did not act arbitrarily and capriciously in arriving at a different decision under the terms of the Plan. See O'Bryan v. Consol Energy, Inc., 477 F.App'x 306, 308 (6th Cir. 2012)(plaintiff did not demonstrate that plan administrators acted arbitrarily and capricious where the explained how they distinguished the decision to award social security benefits).

Plaintiff also argues that Aetna acted arbitrarily in relying on the transferable skills and labor market analyses provided by Coventry. In particular, plaintiff notes that Coventry used a computer program to assist it in identifying sedentary occupations, and that adjustments in the program were made to reflect plaintiff's restrictions by reducing stooping, crawling, crouching, squatting, and climbing to never and adding the need to take short breaks from sitting and standing, but that the program could not be adjusted for walking and activities involving hands. AR 630, 638. Plaintiff's restrictions included walking for up to twenty minutes

at a time, not to exceed a total of two hours in a workday, and fingering, feeling or handling for up to thirty minutes at a time, followed by five minute periods of rest. AR 629-630. However, the fact that these restrictions could not be added to the computer program does not mean that they were not considered by Coventry in identifying suitable sedentary jobs. For example, in its discussion of the engine dispatcher job, Coventry noted that walking is significantly less important. AR 632. The discussion of the tablet tester job notes that in some industries, inspectors sit during most of their shift. AR 634. None of the positions identified describe requirements which would conflict with plaintiff's fingering restrictions. Aetna determined that the occupations identified by Coventry "would not require [plaintiff] to perform any activities that [plaintiff is] medically restricted from performing." AR 492-93.

In any event, the Plan terms do not require Aetna to identify a particular position that a claimant might fill before it determines that the claimant is not disabled, or that such a position existed in a given geographic area. The transferable skills and labor market analyses identified certain jobs which plaintiff could perform at the sedentary work level, taking the restrictions posed by Dr. Rea into account. The reports specified that occupations listed were not all of the occupations plaintiff could perform, but were a sample of the occupations identified as suitable given plaintiff's limitations. AR 630, 638. Because the Plan does not require the identification of a specific job currently available within plaintiff's geographical area, Aetna's failure to do so does not render its decision arbitrary or capricious, where it obtained through proper sources a

33

determination that plaintiff could perform a broad range of sedentary jobs, and the specific jobs listed were merely illustrations of what plaintiff could perform.  See Curry, 400 F.App'x at 70.

VII. Conclusion

The court concludes that Aetna did not act arbitrarily and capriciously in determining that the plaintiff was no longer entitled to disability benefits under the Plan.  In accordance with the foregoing, plaintiff's motion for judgment on the pleadings (Doc. 43) is denied.  Defendants' motion for judgment on the administrative record (Doc. 45) is granted.


Date: March 23, 2015              _____s/James L. Graham_____
                                  James L. Graham
                                  United States District Judge